## HERMAN B. GATES

*v.*

## ANNA GATES.

[Argued March 15th, 1899. Decided May 13th, 1899. Filed May 15th, 1899.]

A husband, who lived apart from his wife in the same village, made his wife a regular monthly allowance. He provided her with fuel and a newspaper. He took her out riding and visited her when she was sick. The wife, however, without any just cause, refused to live with him, one of her reasons being that she thought him unfaithful, but without ground.—*Held*, that the husband was, under the circumstances, entitled to a decree of divorce on the ground of the wife's desertion.

*Mr. William D. Daly,* for the petitioner.

*Mr. Alexander Simpson,* for the defendant.

STEVENS, V. C.

This is a suit for divorce on the ground of desertion. The petitioner and defendant were married in 1864. The petitioner is superintendent of the oil refinery of John Ellis & Company, whose works are situated at Edgewater, on the Hudson river. He has been in the employ of that concern, as superintendent or foreman, for eighteen years. During all that time he has resided at Edgewater. He lived with his wife until June, 1892. Since then, except for a few weeks, he and defendant have lived apart. The petitioner, who appears from the evidence to have been a man of kindly disposition, was much attached to his wife. The defendant, on the other hand, who was of a quarrelsome temperament, imbued with a groundless belief that her husband was unfaithful, appears to have been lacking in attachment to him. Her letters written after the commencement of this suit (the only ones he produces) stamp her as a woman quite unlovely.

For several years prior to 1892, Mrs. Gates was most of the time without servants, not, it would seem, because Mr. Gates was averse to having any, but because Mrs. Gates had not been able to keep them, or possibly because, being extremely jealous, she preferred to do the ordinary house work herself, and have a woman from the neighborhood do the laundry work.   There is no doubt, both from her own evidence and from his, that for years before the separation she had made his life miserable by her groundless charges.   In the early summer of 1892, because of failing health, he had become unable to attend to his duties. He was suffering from nervous dyspepsia or catarrh of the stomach.   He says that, although in this condition, "I never had any rest at home; I could not even lie in bed and rest at night without being disturbed; she scolded and abused me about everything."   To get a little rest, he left his house in June, 1892, and boarded for about ten days in a neighboring village with one of his employes, the witness White.   Then he returned. Before his return, his wife, without consulting him, had made up her mind to go west to the house of her brother, in Ohio. She started on the afternoon of the day he returned.   He says that she said to him that she was going to live with her brother and wasn't coming back.   She says she did not.   She went first to her brother's, then to the house of her son, in Jamestown, New York, and then to her father's house, in Springfield, Massachusetts.   While absent she stated both to Mrs. Southwick and to Mrs. Rifle that she would not go back to live with her husband. She returned to Edgewater from her father's house about the beginning of August.   In the meanwhile her husband had gone to Williamsport, Pennsylvania, where his sister was living. While there he advertised for and obtained a "housekeeper," as she is called, or rather a woman employed to do general house work.   He brought her back with him a short time before the return of Mrs. Gates.   So far the parties agree, but from this point on there is a wide divergence in their evidence.   Mr. Gates says that upon his coming home he started housekeeping with his son; that Mrs. Gates came to his house shortly afterward; said to him that the housekeeper had no business there; refused

to remain over night, although urged to stay, and went to New York. She says that on her return from her father's, she lived with Mr. Gates "maybe four or five or six weeks, something like that," and then went to Asbury Park.

.This much is certain, that on August 11th, 1893, Mr. Gates moved out of the house which he had theretofore occupied, into an adjoining flat; that he left for his wife's use most of the furniture, and that she arranged with a Mrs. Polhemus to move into the house thus vacated and receive her as a boarder. This Mrs. Polhemus did about the middle of August. In the latter part of that month Mrs. Gates again visited her mother. While in Springfield she received a letter from Mr. Gates, asking her to take a trip with him to Fortress Monroe. Persuaded by her mother, she consented to go, and met him in New York. They were gone three weeks and returned by way of Washington. On her arrival at that city late one afternoon, feeling indisposed, her husband went for her to a physician and brought her back some medicine. After he had taken his dinner he, according to his wife's statement, went out, returning about ten or eleven o'clock in the evening. She scolded him, as she says, because he did not come home sooner, and he, in consequence, left the apartment, and she did not see him again till the next morning, when they took the train north. At Philadelphia he left the train. He says it was arranged beforehand that they should stop over there and visit some friends. She denies this, and says that he got off, giving a reason which she did not think proper to repeat in court. She remained in the train and went on to Edgewater alone. He returned a day or two afterwards. From that time on they never lived together. She boarded at the house of Mrs. Polhemus until the spring of 1894 and he occupied the adjoining flat with his sister.

It was earnestly contended that the desertion took place in June and continued with the interruption only of the Fortress Monroe trip. It is therefore important to know when and under what circumstances Mrs. Gates left for Ohio. Mr. Gates' letter of June 5th, written at Williamsport, shows that Mrs. Gates must have left for the west a few days before that date.

Mrs. Gates says that she stayed one week in Cleveland, Ohio, and one week in Jamestown, New York.

Shortly before June 28th, as may be inferred from Mr. Gates' letter of that date, Mrs. Gates must have reached Springfield. Now, Mrs. Gates says that she stayed at her father's house on that occasion; to use her own words, " three or four weeks— maybe more." It is not likely that she reached Edgewater before August. Mr. Gates' sister came to Edgewater on August 11th, so that Mrs. Gates could not have lived with her husband more than two or three weeks at most. I am inclined to think, as Mr. Gates testifies, that she did not live with him at all. I shall not take time to state my reasons for so thinking, for, assuming that she did not, I still think there was no desertion at this period.

· I have reached this conclusion on the letters and testimony of Mr. Gates. Mr. Gates, it is true, testifies that his wife deserted him when she went west and that he then and always thereafter urged her to stay with him, but the letters that he wrote from Williamsport in June and July, 1893, hardly bear out this statement. From their perusal it is apparent, in the first place, that the parting between husband and wife must have been quite amicable, for in his letter of June 5th, two or three days after it occurred, after telling his wife how his sister was and how he was doing, he writes :

"I hope you will write me and let me know how you are enjoying yourself. I will have lots of spare time on hand to read all you have a mind to write. *I have fulfilled my promise* of writing you, and will look for a reply from you."

It is further apparent, in the second place, that some arrangement must have been made in reference to the wife's support. In his letter of June 8th, he encloses $10 with the statement:

"Would [send] the *full* amount for this week, but am a little short just now, and don't want to draw on the bank without it becomes necessary. You say that if I had come to Williamsport in the first place (that is, I suppose, instead of going to Mr. White's house), things might have been different. Now, don't you know what a rumpus you would have started if I had spoke of going anywhere? * * * You seemed determined that, whether sick or well, I must

Gates v. Gates.

be abused just about so much if I did or mentioned doing or going anywhere that did not happen to suit you, and this I can't nor will not stand. I am old enough not to have a "——

Here the exhibit ends, a page being missing. This passage points to a quarrel followed by some sort of arrangement in reference to an allowance, made with a view to either a temporary or permanent separation. What otherwise can we understand by the expression, " full amount." " Things might have been different ? "

In his letter of June 21st we find the following passage :

" When you say that you have always treated me kindly when I was sick, first let me ask you how long it is since you told me if I behaved myself like other men, I would be all right, and you guessed that there was no more the matter with me than anybody else, if I wanted to behave myself. These things show your feelings in the matter, and of course you cannot treat anyone right when you think they are so entirely bad. * * * *Now, the last time I left home, I left for good. I see there is no use trying it again.* Your kind offer that I may come home again if I treat you right, I am thankful for, but will not avail myself of it. I went away to stay, and stay I will."

This passage appears to point to a determination on the part of Mr. Gates not under any circumstances to live again with his wife. But it is immediately followed by another which points apparently in the opposite direction. He continues :

" Of course, I cannot take the housekeeper home with me, and if, when I get back to work again, you make it too warm for me, as you once told me you would, then I will go away for good."

Standing by itself, this passage might refer to a determination (already formed) to take the flat adjoining his home, which he afterwards occupied, and his expression, " I will go away for good," might refer to his leaving Edgewater, in order to avoid meeting his wife even out of doors. But then he continues, " for if I have to live in such a quarrel at home or board away and be harassed all the time, I cannot keep well. That is out of the question." What this last passage means, I do not know.

On cross-examination, Mr. Gates' attention was called to these passages, and he was asked the question, " When you wrote that

Gates v. Gates.

letter were you still in this frame of mind that you wanted your wife to come back to you?" to which he replied, "Evidently not."

On June 28th he wrote as follows:

"DEAR WIFE—You will see by this that we are at home again—arrived last night. * * * Of course I would treat you nice when you was going away, as I always have, for there is no telling what may happen before we meet again, and I would not want to think, if anything did happen that we never met again, that we parted in anger."

Then he tells why he hired the housekeeper and continues:

"This seemed the best thing for me to do under the circumstances. It is quite evident that we cannot live together and me keep well, for the fear all the time of coming into the house only to be abused has got to working on my mind so that I feel all the time when I am in as though I was over a powder magazine, and so, after coming home after the worry of the ten hours, when I ought to feel easy and rest, I am worried much more so than at the works, and I am not going to get well in this way. Now, it is quite evident that you are firmly convinced in your own mind that I am entirely to blame and that I am thoroughly bad—bad all through; and a man who is so bad cannot be well. As I know that I am not bad, and as I know that no one else says I am bad but you, there is and always will be trouble between us, for as you told me that nothing could convince you that all you said about me was not so, is it not better for us to live apart? Of course you have a perfect right to this as your home; and if you see fit to make it warm for me, as you told me you would, then I must get out. But you know that I am to get the living for the three of us, and if I am driven to the wall and give out entirely, then perhaps we will all suffer; and as this is where the business is that gives me the living, here I must stay. * * * Unless I am mistaken this woman can run the house and keep it in good order, and I can live peaceably if not happy. If you decide to come back after you get your visit, then I can send her back *and I can pull out, for I am satisfied you will never treat me any different.* * * * *I shall pay you the money, no difference where you are.*"

In the last of the letters written during this period, under the date of July 2d, he says:

"I do not expect to be happy. * * * It is not possible for you to feel this change in our lives more keenly than I do, and if I was to be granted but one wish it might be that we might come together again and be happy."

I think it must be admitted that these letters point much more strongly to a resolution on the part of Mr. Gates to sepa-

rate himself from his wife than they do to a resolution on her part to stay away from him. Taking the letters in connection with the testimony heretofore adverted to, we may at least conclude as follows:

*First.* That the parties had lived together unhappily for several years and that this condition of affairs was almost wholly due to the disagreeable temper and unfounded suspicions of the wife.

*Second.* That in May, 1893, Mr. Gates was a sick man:—so weak and nervous that he could no longer stand his wife's complaints,—and that in consequence he sought refuge for ten days at the house of an employe of the works, Mr. White.

*Third.* That this action on his part was highly offensive to his wife, who then made up her mind to go to the house of her brother in the west and make an indefinite stay there, but that, not finding things as pleasant there as she had anticipated, she went first to Jamestown and then to Springfield.

*Fourth.* That, having communicated her resolve to go away, to her husband, it was agreed between them that their differences were such that they could no longer live together, and that, in consequence, Mr. Gates promised to give his wife, wherever she might determine to live, a fixed allowance.

*Fifth.* That during the months of June and July, 1893, Mr. Gates' mental attitude was that of a man who did not greatly desire a permanent separation, but who had come to the conclusion that it was inevitable.

Of course, if these conclusions are warranted by the evidence no ground for divorce is shown. It is a case of agreement to live separate and not a case of desertion.

The question then is whether the position of the parties underwent a change and whether Mr. Gates subsequently sought to effect a renewal of marital relations, a renewal which Mrs. Gates obstinately declined.

As bearing upon this question, I think the evidence pretty clearly shows that Mr. Gates was much attached to his wife, while, on the other hand, it indicated, perhaps no less clearly, that Mrs. Gates was devoid of real regard for her husband.

Gates *v.* Gates.

Considering the circumstances which preceded and gave rise to the parting, it is surprising to find how kindly the general tenor of Mr. Gates' letters is. It is quite apparent that had Mrs. Gates made any real advances toward a reunion or given her husband any reason to suppose that she would treat him differently, he would have welcomed her home. In the last of the letters, from which I have already quoted (that of July 2d, 1893), he says :

"If you could treat me as well as you always do strangers and *wanted to* live happy with me and drop this senseless jealousy, there would be nothing in the way and no [thought] of you or me wanting another place."

And again :

"It is not possible for you to feel this change in our lives more keenly than I do, and if I was to be granted but one wish, it might be that we might come together again and be happy."

There is nothing either in the letters that he afterwards wrote or in his subsequent conduct toward her that indicate any change in these feelings. It is hardly supposable that her husband, after manifesting his good will toward her by taking her to Fortress Monroe, in September, 1893, would have refused to receive her had she gone to his home. She did not do so. On the contrary, after returning to Edgewater, she appears to have found pleasure in insulting and humiliating him. There is no decisive proof that Mr. Gates asked her to return to him on the Fortress Monroe trip. It is merely his statement against hers. But there is satisfactory evidence that on at least two occasions, while she was boarding at Mrs. Polhemus', he did ask her. We have, first, his own evidence that after seeing her he arranged that his sister, Mrs. Davidson, who was, without reason, so far as I can see, obnoxious to her, should go away in order that Mrs. Gates might return. In this he is corroborated by Mrs. Davidson, who says that she twice packed up her things for that reason ; and by Mrs. Polhemus, a witness called for the defence, who says that in the following winter (the winter of 1893–94) Mr. Gates told her she would have to give up the house, as he expected to go to housekeeping with Mrs. Gates,

and that Mrs. Gates came in one afternoon apparently quite downhearted, and told her that she had had some words with Mr. Gates on the boat, and that for that reason they were not going to live together, that she "had put her foot in it again." This occurred before May 3d, 1894, for, in a letter of that date, Mr. Gates writes to his wife: "I have not forgotten the unprovoked abusing you gave me, coming up on the boat, just at a time when I was planning to live with you again."

I think that, from the time of this refusal, Mrs. Gates *did* obstinately desert her husband, and that such desertion continued for more than two years thereafter. This further appears by her declarations, her conduct and even from some unguarded expressions in her own testimony.

First, her declarations. She told Catherine Sullivan that she would never go home again. She told Peter Peterson that "she would not live with that old devil any more." On cross-examination, she says: "I might have said that I would not live with the old duffer any longer; I don't say that I didn't say it; I didn't mean it."

Her conduct is more significant than her declarations. In September, 1894, as Mrs. Taylor was coming out of church she went up to her, although Mr. Gates and Mrs. Taylor were not even acquaintances, called her a black-eyed b—— and accused her of living with her husband. Mrs. Davidson, Mr. Gates' sister, testifies that Mrs. Gates seldom passed her in the street without saying something insulting to her. Mr. Gates says, speaking of this period, that she abused him on the highways and on the ferryboat publicly, and that on one occasion she pushed him off his bicycle, in the city of New York, accusing him before a crowd of having clandestine meetings with another woman. Mrs. Gates admits having hit him either on or just after he left the ferryboat and thrown him off his bicycle. Perhaps she gave the most characteristic exhibition of her disposition when she broke the window of the house to which Mr. Gates and his sister had returned in October, 1895. This happened shortly prior to March 3d, 1896. This is Mrs. Gates' account of what happened :

" I was going along the street and Mr. Gates was coming up from the works, and I said to myself, ' Well, now, I have a good mind to go in there and just go around the house and sit down and have my dinner and just demand my rights as his wife in that house.' "

I stop here to observe that Mrs. Gates says on cross-examination that she had, shortly before, consulted a lawyer, but she does not say that he had advised this course of proceeding, and she does not pretend that either the lawyer, if she had really consulted any, or that she herself had written previously, requesting that her husband restore her to her proper place or that she had in any way whatever signified to him her desire or willingness to return.    Mr. Gates says that the first thing that he heard her say on this occasion was that she was going to get in and throw " that thing," meaning his sister, out.    I will let Mrs. Gates describe what followed in her own words:

" I went around to the back door and tried to get in the back door, but Mr. Gates stood with his back against it and his sister stood with her back against the door, and I shoved the door and pushed it and tried to open it, but they would not let me in; and as I looked through the window she shook her head at me.    I went back to the door and kept pushing it for a long time.   I said I would go in, and Mr. Gates called out to me to stop pushing the door.   Then I heard him say to his sister, ' Siss, you had better open the door or else she will push it in.'   But she would not open the door.   She stood just there and held it, and he stood there too.   Then I went to the kitchen window and looked in and saw her there, and I picked up a little basket of some kind with some kind of moss in it and hit the window-sash with it and cracked it, and she was in the kitchen at the time."

Both Mrs. Davidson and the servant say that the object that she threw was a box, and it was thrown with so much violence that, breaking the kitchen window, it went through it with force enough to strike the door leading into the hall.    Mrs. Davidson says it would have hit her had she not got out of the way. Finally some one went for Mr. Gates' son, who was the village marshal, and he took her away.

Now, this performance, when contrasted with the conduct of Mr. Gates, all through this trying period, seems all the more extraordinary.    It would be hard to believe that he could have acted towards her with the kindness and forbearance with which

he testifies that he did if he were not fully corroborated by the evidence of Mrs. Gates. He made her a regular allowance of $40 a month; he provided her with fuel and a newspaper; he took her out riding and visited her when she was sick. He says he did this

"for the sake of keeping peace; to let her see that it was my desire to make it pleasant for her and help her; * * * that it was my desire to get her to come back if she would do it"

During all this time Mrs. Gates does not allege a single tangible act of harshness or want of consideration on her husband's part. The one idea that seemed to possess and dominate her was that Mr. Gates was unfaithful, although so far as the evidence shows this was the purest illusion. Penetrated with this idea, she did not hesitate to employ a detective to watch him (who could not, however, get the least evidence of any act of misconduct), and to invade the home of one of the employes of the oil works and there accuse an innocent girl of having a child by him.

Her jealousy appears to have extended to the servants in the house and even to Mr. Gates' own sister. Although Mrs. Gates lived either next door or in the neighborhood for five years after Mrs. Davidson came there, she did not once call upon her. On the other hand, she openly abused her on the streets without the least reason. She does not pretend that she had any other grievance against her than that she was living with her brother.

This brings me to a significant admission made by Mrs. Gates, on her cross-examination. Being asked—

"Didn't she [i. e., Mrs. Sullivan, who had testified in reference to her admissions] tell you that you had a lovely and comfortable home, and you ought to go back to it?"

She replied:

"No, sir; she has often said that I would [should] go back and live with Mr. Gates. I said, How can I live with him? he is living with his sister."

Gates v. Gates.

Now, Mr. Gates might, as a matter of law, have insisted that his sister, who was dependent upon him for support, should be allowed to live with him. But he did not. On the contrary, he was willing to support this sister elsewhere if she constituted the obstacle to Mrs. Gates' return. I have already shown that on two occasions, while Mrs. Gates was boarding with Mrs. Polhemus, in the fall of 1893 and the winter of 1894, Mrs. Davidson had made ready to go, and that then Mrs. Gates refused to return, after having first agreed to do so.

I think the following conclusions, in reference to the period subsequent to the Fortress Monroe trip, are warranted by the foregoing evidence:

*First.* That Mr. Gates was fond of his wife and desired her return.

*Second.* That Mrs. Gates was indifferent to him and quite willing to live apart from him.

*Third.* That Mr. Gates made proper efforts to bring her back, and actually induced her to agree to live with him again.

*Fourth.* That this agreement was broken by Mrs. Gates, without fault on the part of Mr. Gates and without his consent.

There are obvious reasons why Mrs. Gates, looking at the matter from her standpoint, should have preferred to live separate. Her two sons, who were her only children, were old enough to support themselves, one being seventeen or eighteen and the other twenty-seven. She was receiving a regular allowance from her husband. She was more independent—more free from household cares. As she was without affection for her husband and firmly convinced of his unfaithfulness, she could not have desired his companionship.

It is said that Mr. Gates wrote two letters to his wife—one on May 3d, 1894, and one of uncertain date—which are inconsistent with the theory that his wife remained away against his will. They require careful consideration. The letter of May 3d (which is, however, imperfect) contains the following passage:

"In conclusion I wish to say I cannot call upon you for the reason that I am entirely through listening to the disagreeable things you say to me when we meet. I have not forgotten the unprovoked abusing you gave me coming

Gates *v.* Gates.

up on the boat just at a time when I was planning to live with you again.  I have submitted to your tyranny for a good many years, until I am almost worn out, and I do not feel as though I had any manhood left. . *Now that I have cut loose to save myself,* and am providing for you, it seems as though you might cease troubling me.  In looking after my health and business, I seem to have all that I wish to attend to."

It is said that this is the language of one who consents to a separation, and not of one against whose will it is continuing.

The statute declares that the *desertion* must be willful, continued and obstinate.  The desertion is the act of the deserter, and the obstinacy entering into the act must necessarily be the deserter's obstinacy.  It is, strictly speaking, incorrect to appeal in the first instance, as appears to have been done in some of the cases, to the mind of the party deserted.  As was said in *Van Wart* v. *Van Wart, 12 Dick. Ch. Rep. 598,* that desertion is to be characterized as obstinate which is persisted in by the deserter against the effort or influence of the deserted party to bring it to an end.  If the deserted party, being a husband, makes a proper effort—makes, in the language of the cases, such advances and concessions as a just man ought to make—to terminate the desertion, and those advances are *obstinately resisted,* and so prove unavailing, then the mental attitude of the deserted party, which can hardly fail in some measure to be affected by the refusals of the deserting party, is a matter of no consequence unless it shows itself in action or in conduct from which a fresh consent may be implied.

In this case, as I have found, the original separation was consented to by both parties.  As long as so consented to there was no desertion.  But as soon as Mr. Gates made a proper effort to induce his wife to return—an effort which she obstinately resisted by refusing to do as she had agreed—then I think she became a deserter, and it lay upon her to show affirmatively a further or renewed consent to live apart.  The evidence is that after his first effort had proved futile he made a second.  In doing so and in treating her as I have shown that he treated her, I think he made all the effort and concession which, under the circumstances, could reasonably have been required.  The state-

Gates v. Gates.

ment in his letter, "Now that I have cut loose to save myself and am providing for you," does not, in the light of the evidence heretofore adverted to, show a fresh consent to live apart. It is the statement of something that, as I have shown, had actually occurred. He did "cut loose from" his wife when he went to Williamsport and she went west. The difficulty arises out of his statement of the severance as a continuing severance— "I *have* cut loose." But a perusal of Mr. Gates' letters will show that accuracy of expression is not one of their characteristics. The statement in question is not the statement of a fact contradicting or negativing the facts already mentioned. It is rather the statement of Mr. Gates' view of his acts taken as a whole—a view somewhat erroneous if the other evidence is to be believed. While the admission is undoubtedly evidence for the defendant, it is not, I think, sufficient to outweigh the considerable body of evidence on the other side. There is nothing in the expression and nothing in his conduct which indicates that he had again *agreed* or *consented* to live separate or that he would not have received her back if she had been willing to go back.

The other letter is "Exhibit D 8." This was put in as one letter, but Mr. Gates testifies, and an inspection shows, that pages 5 and 7 were not written at the same time the first page was written. The first page is dated December 25th, 1895. If pages 5 and 7 were written after May 3d, 1896, then what he wrote would make no difference, for two years of continuous desertion had elapsed. He first testified that he wrote the letter of which they formed part after he wrote the letter of December 25th, but he could not fix any date, and Mrs. Gates does not fix any. As she was endeavoring to prove by Mr. Gates' letter, produced from her custody, that the desertion did not continue for the requisite period, the burden was upon her to show when it was written. On his cross-examination he says he thinks he was mistaken; that the letter was written "while Mrs. Gates was away after first leaving." It would then have been written some time in July, 1893. He finally says that he has no recol-

8

lection whatever about the date. The importance of the letter hinges on its date in connection with the following paragraph :

"I may say, in starting, that the proposition you make would be very pleasant to me indeed if it could be carried out to the satisfaction of both of us, but it is an impossibility for you to change your way of treating me, and the reason is very simple—you have no confidence in me. * * * Therefore, the question of again living together again, however much I may desire it, seems to me to be out of the question for the present."

From some expressions contained in the part of this letter which is produced, I should doubt whether it was written in July, 1893. It might possibly have been written shortly before they agreed to live together again, or it might have been written long after. Mr. Gates says that the proposition here alluded to, which his wife made to him, was that he should turn his sister out. This was a proposition that he was not bound to accept. Not only are the five first pages of this letter missing, but page 6, which seems to have contained matter that would have enabled us to fix its date with some exactness, is also gone. The letter is of little or no significance as evidence unless it be proved to have been written at a certain period, and this proof is altogether wanting.

The fact that the husband supported his wife is no bar to a decree in his favor. *Sergent* v. *Sergent, 6 Stew. Eq. 204; S. C. on appeal, 9 Stew. Eq. 644; Bish. Mar. & D.* 1, § 805 a. In the *Sergent Case,* as will be seen by a perusal of the vice-chancellor's opinion, the wife gave the husband a continuous support after he left her, and this did not, in the judgment of the court of appeals, constitute a valid objection to a decree in her favor.

On the whole, I have come to the conclusion, but not without difficulty, that Mr. Gates is entitled to a decree.